IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


REED ELSEVIER, INC.,            :

      Plaintiff,            :

           Case No. 3:10cv248

      vs.            :

           JUDGE WALTER HERBERT RICE

CRAIG M. CROCKETT, et al.,            :

      Defendants.            :

---

EXPANDED OPINION SETTING FORTH REASONING AND CITATIONS
OF AUTHORITY IN SUPPORT OF DECISION OF MARCH 31, 2011
(DOC. #39), TO SUSTAIN PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (DOC. #7); CONFERENCE CALL SET

---

This litigation stems from Defendants' demand for arbitration on a classwide

basis.[1]  The Plaintiff's LexisNexis Division ("Lexis") provides, inter alia,

computerized legal research to lawyers.  Defendants entered into two agreements

with Lexis.  Each of those agreements contained clauses requiring that disputes

---

[1]The Defendants are Craig M. Crockett, as alleged assignee of DeHart & Crockett,
P.C., and Craig M. Crockett P.C., d/b/a/ the Crockett Firm.  Throughout this
Opinion, the Court refers to them collectively as "Defendants."

between the parties be resolved through arbitration.[2]  Defendants' agreements with Lexis gave them unlimited access to certain of Lexis' databases, while charging them if they searched other databases.  That type of agreement is referred to as a Preferred Pricing Materials Plan ("PPM Plan").  After having been required to pay for searches on databases that were beyond those covered by the agreements with Lexis, Defendants submitted a demand for arbitration to the American Arbitration Association ("AAA"), in February, 2010, contending that Lexis should have provided pop-ups, warning a customer when it was about to search a database which is not covered by the customer's agreement with Lexis.

Rather than merely seeking to resolve their own dispute with Lexis, the Defendants have demanded class arbitration.  In their most recent demand for arbitration, Defendants identify the following class, containing two sub-classes, which they seek to represent:

a. CUSTOMERS USING [LEXIS'] RESEARCH "PACKAGES"
i. (a.) All customers who:
(1) were engaged in a Lexis [Subscription Agreement] having a PPM Plan;
(2) received an oral or written representation from LN [LexisNexis] that the PPM Plan would provide a "$" pop-up icon warning to notify the customers in advance of any research task extending beyond their respective PPM Plan when an item of research attempted to be accessed by use of [Lexis'] hyper linking feature would be outside of and beyond the flat fee charges of the PPM Plan; and
(3) received a bill or invoice from LN for any item of research accessed by use of [Lexis'] hyper linking feature outside of and beyond the flat fee charges of the PPM Plan; and paid the [Lexis] bill or invoice, in whole in (sic) or part for any item of research accessed by use of [Lexis'] hyper linking

---

[2]The language of the arbitration clauses is quoted in their entirety below.  See infra at 16-17.

feature outside of and beyond the flat fee charges of the PPM Plan or passed the [Lexis] invoice or bill on to a client, in whole or in part for any item of research accessed by use of [Lexis'] hyper linking feature outside of and beyond the flat fee charges of the PPM Plan.
b. CLIENTS OF CUSTOMERS USING [LEXIS'] RESEARCH "PACKAGES"
i. All clients of the members of the Class set forth in "a." above who were billed and paid for any item of research accessed by use of [Lexis'] hyper linking feature outside of and beyond the flat fee charges of the PPM Plan for research by the Class set forth in (a.).

Doc. #18-1 at 7-8.  Defendants seek to recover compensatory damages in excess of $500 million in the classwide arbitration.

On April 27, 2010, the United States Supreme Court decided Stolt-Nielsen S.A. v. AnimalFeeds International Corp., — U.S. —, 130 S.Ct. 1758 (2010), wherein the Court limited class arbitrations.  Approximately two months later, Plaintiff initiated this litigation, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., setting forth two claims seeking declaratory and injunctive relief:

2.  [Lexis] is seeking a declaration that [Defendants are] precluded, by law, from pursuing any claims in arbitration on behalf of any purported class.  The arbitration agreements upon which [Defendants base their] arbitration demand, by their plain terms, do not authorize arbitration on a class basis. Accordingly, as confirmed by the Supreme Court's recent holding in Stolt-Nielsen v. Animal Feeds [sic] Int'l Group, [— U.S. —, 130 S.Ct. 1758 (2010)], the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA") bars [Defendants] from seeking to compel class arbitration, and the AAA (and any arbitrator appointed by the AAA) lacks power to conduct such an arbitration.

3.  [Lexis] is also seeking a second declaration, in the alternative, that [Defendants are] precluded from asserting claims on behalf of a putative class in the AAA Arbitration because the vast majority of members of the putative class that [Defendants have] alleged are not parties to any arbitration agreement at all with [Lexis], much less an arbitration agreement

that is substantively the same as the arbitration agreement between [Lexis] and [Defendants].

Plaintiff's Complaint (Doc. #1) at ¶¶ 2-3.

In its Order of March 31, 2011 (Doc. #39), this Court sustained Plaintiff's Motion for Partial Summary Judgment (Doc. #7), and indicated that it would file an Expanded Opinion setting forth its reasoning and citations of authority in support of that Entry.  With that motion, Plaintiff seeks summary judgment on the first claim alone in its Complaint, a description of which is set forth in the above-quoted ¶ 2 from that pleading.[3]  As a means of analysis, the Court will initially review the procedural standards it must apply whenever it rules on a motion seeking summary judgement, partial or otherwise,[4] following which the Court will turn to the parties' arguments in support of and in opposition to the instant such motion.

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on

---

[3]Plaintiff has captioned its motion as one for summary judgment.  Since, however, Plaintiff seeks such on only the First Claim for Relief in its Complaint, this Court refers to that motion as one for partial summary judgment.

[4]Rule 56 of the Federal Rules of Civil Procedure has been amended extensively, effective December 1, 2010.  Since this matter was fully briefed before that amendment became effective, this Court applies the pre-amendment version of that Rule.

file, together with the affidavits, if any," which it believes
demonstrate the absence of a genuine issue of material fact.

Id. at 323. See also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991)

(The moving party has the "burden of showing that the pleadings, depositions,

answers to interrogatories, admissions and affidavits in the record, construed

favorably to the nonmoving party, do not raise a genuine issue of material fact for

trial.") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir. 1987)). The

burden then shifts to the nonmoving party who "must set forth specific facts

showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Thus, "[o]nce the

moving party has met its initial burden, the nonmoving party must present evidence

that creates a genuine issue of material fact making it necessary to resolve the

difference at trial." Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245

(6th Cir. 1995). Read together, Liberty Lobby and Celotex stand for the proposition

that a party may move for summary judgment by demonstrating that the opposing

party will not be able to produce sufficient evidence at trial to withstand a directed

verdict motion (now known as a motion for judgment as a matter of law.

Fed.R.Civ.P. 50). Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir.

1989).

Once the burden of production has so shifted, the party opposing summary

judgment cannot rest on its pleadings or merely reassert its previous allegations. It

is not sufficient to "simply show that there is some metaphysical doubt as to the

material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

586 (1986). See also Michigan Protection and Advocacy Service, Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. Anderson, 477 U.S. at 255 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the

nonmoving party's claim." Interroyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990). See also L.S. Heath & Son, Inc. v. AT&T Information Systems, Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n. 7 (5th Cir.), cert. denied, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

At trial, Plaintiff will bear the burden of persuasion on its request for declaratory relief. Therefore, this Court will briefly review the procedural standards, different from those set forth above, which it must apply to resolve the Government's motion seeking summary judgment. In Arnett v. Myers, 281 F.2d 552 (6th Cir. 2002), the Sixth Circuit discussed what the moving party must show to be entitled to summary judgment on an issue on which it will bear the burden of persuasion at trial, writing "if the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.' 11 James William Moore et al., Moore's Federal Practice § 56.13[1], at 56-138 (3d ed. 2000)." Id. at 561.

As indicated, Plaintiff seeks summary judgment on the First Claim for Relief in its Complaint (Doc. #1), with which it seeks a declaration that Defendants are precluded from pursuing class arbitration, given that the arbitration clauses in the agreements between Defendants and Lexis do not authorize arbitration on a classwide basis.  Broadly speaking, Plaintiff's Motion for Partial Summary Judgment potentially raises two issues, to wit: is this Court or an arbitrator to decide whether the arbitration clauses in those agreements authorize arbitration on a classwide basis; and 2) if the answer to the first question is that the Court must make that determination, do the arbitration clauses at issue herein authorize such arbitration?  As a means of analysis, the Court will initially resolve the question of who decides.  If it concludes that the decision is for this Court, rather than for an arbitrator, it will address the parties' arguments concerning the issue of whether the arbitration clauses herein authorize class arbitration.


I.  Is It for this Court or for an Arbitrator To Decide Whether the Arbitration Clauses in the Agreements Between Lexis and the Defendants Authorize Class Arbitration?

In answering this question, the Court starts from the fundamental, uncontested premise that, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."  AT & T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649 (1986).  Herein, the issue is whether Plaintiff agreed to arbitrate with absent class members, which, for reasons that follow, this Court concludes is a question for judicial resolution.

Two Supreme Court decisions touch on the question of whether a court or an arbitrator must resolve the issue of whether an arbitration provision authorizes class arbitration.  In Green Tree Financial Corp. v. Bazzle, 539 U.S. 444 (2003), a plurality of the Court concluded that an arbitrator, rather than a court, should decide whether an arbitration clause authorizes class arbitration.  The Stolt-Nielsen Court stressed, however, that only a plurality had addressed that issue, while concluding that it was not necessary to revisit the question therein, given that the parties had stipulated that the question was for the arbitrator to decide, at least initially.  — U.S. at —, 130 S.Ct. at 1772.[5]  In accordance with the reasoning of the Supreme Court in Stolt-Nielsen, this Court concludes that neither that decision nor the decision of the Court in Bazzle, resolved the above question.[6]  Accordingly, this Court turns to other decisions by the Supreme Court, addressing the question of what issues a court must decide and what matters are reserved for the arbitrator, in an effort to resolve the question set forth above.

In John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543 (1964), the Court concluded that an arbitrator rather than a court must "decide whether procedural prerequisites which, under the [collective] bargaining agreement, condition the duty

---

[5]The Stolt-Nielsen Court explained that, in Bazzle, Justice Stevens, who joined in the judgment of the plurality, found it unnecessary to address the issue of whether a court or an arbitrator should decide whether an arbitration clause authorizes arbitration on a class basis.

[6]Thus, this Court rejects Defendants' argument to the contrary.  See Doc. #29 at 7-9 (arguing that the Supreme Court's "holding" in Bazzle controls resolution of the question of whether a court or arbitrator decides that class arbitration is permitted by the arbitration clauses between the parties, without acknowledging that the "holding" in Bazzle is merely a plurality opinion).

to arbitrate have been met." Id. at 544. Therein, a union brought suit in federal court under § 301 of the Labor Management relations Act, 29 U.S.C. § 185, to compel a successor corporation to arbitrate disputes with the union over the applicability of the collective bargaining agreement between the union and the employer's predecessor. The employer argued that it was not required to arbitrate the matter for a number of reasons, including that the union had failed to follow one of the steps set forth in the arbitration provision of the collective bargaining agreement, leading to arbitration. The Supreme Court referred to that issue as one of "procedural arbitrability" and held that such procedural questions must be resolved by the arbitrator, because they can quite possibly be intertwined with the merits of the parties' dispute. Id. at 555-59.[7]

In First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995), the Supreme Court addressed the question of whether the arbitrator or the court must decide if the parties have agreed to arbitrate the merits of a dispute.[8] Id. at 942. The First Options Court concluded that resolution of the question of who decides arbitrability is to be determined by reference to what the parties agreed about the matter. Id. at 943. To determine whether the parties agreed to allow the

_____

[7]The John Wiley & Sons Court also concluded that the issue of whether a successor corporation was bound by a collective bargaining agreement entered into by its predecessor must be resolved by a court rather than by an arbitrator.

[8]Therein, First Options had entered into a number of agreements containing arbitration provisions with an entity called MK Investments, Inc. ("MK"). MK was owned by Manuel Kaplan, whose wife was Carol Kaplan. First Options demanded that MK, Manuel Kaplan and Carol Kaplan arbitrate a dispute. The latter two objected on the basis that they had not agreed to arbitrate any disputes with First Options.

arbitrator to decide the question of arbitrability, courts should apply state law principles of contract construction, while declining to assume that the parties agreed to arbitrate arbitrability, unless there is clear and unmistakable evidence that they did so.  Id. at 944.  In First Options, the Court held that the court should decide whether the question of arbitrability was arbitrable, given the absence of such clear and unmistakable evidence.

In Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002), a brokerage firm brought an action to enjoin a customer from arbitrating a dispute between the two before the National Association of Securities Dealers ("NASD"), arguing that the customer's demand for arbitration was time-barred by a NASD rule.  That rule provided that "no dispute 'shall be eligible for submission [to arbitration] … where six (6) years have elapsed from the occurrence or event giving rise to the … dispute.'"  Id. at 82.  The brokerage firm argued that the question of whether the dispute had been submitted in timely fashion and, thus, was eligible for arbitration raised an issue of arbitrability.  The Supreme Court disagreed.

As an initial matter, the Howsam Court reiterated that:

Although the Court has long recognized and enforced a "liberal federal policy favoring arbitration agreements," Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983), it has made clear that there is an exception to this policy: The question whether the parties have submitted a particular dispute to arbitration, i.e., the "question of arbitrability," is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise."  AT & T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649 (1986) (emphasis added).

Id. at 83.  The Court cautioned therein that only certain issues raise the question of arbitrability:

Linguistically speaking, one might call any potentially dispositive gateway question a "question of arbitrability," for its answer will determine whether the underlying controversy will proceed to arbitration on the merits. The Court's case law, however, makes clear that, for purposes of applying the interpretive rule, the phrase "question of arbitrability" has a far more limited scope. See 514 U.S., at 942. The Court has found the phrase applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

Id. at 83-84. Thus, the Howsam Court noted that a "gateway dispute about whether the parties are bound by a given arbitration clause" and "a disagreement about whether an arbitration clause in a conceitedly binding contract applies to a particular type of controversy" are for the court to resolve. Id. at 84. In contrast, since procedural questions are presumptively not for the court, the arbitrator must decide whether there has been compliance with the initial steps in a grievance procedure, waiver and delay. Id. at 84-85. Since the time limitation on demanding arbitration was similar to those gateway questions presumptively for the arbitrator, the Howsam Court concluded that the timeliness of a demand for arbitration was presumptively for the arbitrator to resolve.

Herein, this Court concludes that the issue of whether an arbitration agreement authorizes class arbitration fits more closely with the decisions of the Supreme Court, addressing the question of arbitrability, and that, therefore, this Court must resolve the question of whether the parties' arbitration agreement

authorizes such arbitration.[9] In reaching that conclusion, this Court notes that it is being asked to resolve "a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy" (Howsam, 537 U.S. at 84), to wit: whether the arbitration provisions in the parties' agreement' apply to classwide arbitration. The Court's conclusion is also supported by the discussion of class arbitration in Stolt-Nielsen. That discussion, which follows, demonstrates that whether an agreement authorizes class arbitration is one of those "narrow circumstances where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate." Howsam, 537 U.S. at 83-84.

In Stolt-Nielsen, the Supreme Court held that imposing class arbitration on parties, when their arbitration agreement is silent on the question, is inconsistent with the FAA. As is indicated above, the Stolt-Nielsen Court did not address the question of whether a Court or arbitrator should decide whether the parties' arbitration agreement authorized class arbitration, other than to stress that a majority of the Court had not decided that question. The Stolt-Nielsen Court wrote:

_____

[9]There is no indication in their agreement that the parties intended that an arbitrator resolve that question.

- 13 -

In certain contexts, it is appropriate to presume that parties that enter into an arbitration agreement implicitly authorize the arbitrator to adopt such procedures as are necessary to give effect to the parties' agreement. Thus, we have said that "'"procedural" questions which grow out of the dispute and bear on its final disposition' are presumptively not for the judge, but for an arbitrator, to decide." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002) (quoting John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557 (1964)). This recognition is grounded in the background principle that "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204 (1979).

An implicit agreement to authorize class-action arbitration, however, is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate. This is so because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator. In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 31 (1991); Mitsubishi Motors [v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985)]; see also 14 Penn Plaza LLC v. Pyett, 556 U.S. —, —, 129 S.Ct. 1456, 1463-65(2009) ("Parties generally favor arbitration precisely because of the economics of dispute resolution") (citing Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 123 (2001)); [Alexander v. Gardner-Denver Co., 415 U.S. 36, 57 (1974)] ("Parties usually choose an arbitrator because they trust his knowledge and judgment concerning the demands and norms of industrial relations"). But the relative benefits of class-action arbitration are much less assured, giving reason to doubt the parties' mutual consent to resolve disputes through class-wide arbitration. Cf. First Options, supra, at 945 (noting that "one can understand why courts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate" contrary to their expectations).

Consider just some of the fundamental changes brought about by the shift from bilateral arbitration to class-action arbitration. An arbitrator chosen according to an agreed-upon procedure, see, e.g., supra, at ----, no longer resolves a single dispute between the parties to a single agreement, but instead resolves many disputes between hundreds or perhaps even

thousands of parties. See App. 86a ("[W]e believe domestic class members could be in the hundreds" and that "[t]here could be class members that ship to and from the U.S. who are not domestic who we think would be covered"); see also, e.g., Bazzle, 351 S.C., at 251, 569 S.E.2d, at 352-353 (involving a class of 1,899 individuals that was awarded damages, fees, and costs of more than $14 million by a single arbitrator). Under the Class Rules, "the presumption of privacy and confidentiality" that applies in many bilateral arbitrations "shall not apply in class arbitrations," see Addendum to Brief for American Arbitration Association as Amicus Curiae 10a (Class Rule 9(a)), thus potentially frustrating the parties' assumptions when they agreed to arbitrate. The arbitrator's award no longer purports to bind just the parties to a single arbitration agreement, but adjudicates the rights of absent parties as well. Cf. Ortiz v. Fibreboard Corp., 527 U.S. 815, 846 (1999) (noting that "the burden of justification rests on the exception" to the general rule that "one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process" (internal quotation marks omitted)). And the commercial stakes of class-action arbitration are comparable to those of class-action litigation, cf. App. in No. 06-3474-cv (CA2), at A-77, A-79, ¶¶ 30, 31, 40, even though the scope of judicial review is much more limited, see Hall Street [Associates, LLC v. Mattel, Inc., 552 U.S. 576, 588 (2008)]. We think that the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings.

130 S.Ct. at 1775-76.

Thus, the Supreme Court has recognized that deciding whether the parties have agreed to class arbitration is not the same as applying procedural rules and . Indeed, in AT&T Mobility LLC v. Concepcion, — U.S. —, 131 S.Ct. 1740 (2011), the Supreme Court reiterated those distinctions between classwide and bilateral arbitration.

Based upon the foregoing, this Court concludes that it, rather than the arbitrator, must decide whether the parties' arbitration agreements herein authorize class arbitration and turns to that question.

## II. Do the Parties' Arbitration Agreements Authorize Class Arbitration

As is indicated above, the parties have entered into two agreements concerning computer assisted research. The arbitration clause in the parties' first agreement, which is referred to as an "Order," provides:

### 2. Arbitration

Except as provided below, any controversy, claim or counterclaim (whether characterized as permissive or compulsory), arising out of or in connection with this Order (including any amendment or addenda thereto), whether based on contract, tort, statute or other legal theory (including but not limited to any claim of fraud or misrepresentation) will be resolved under this section and the then-current Commercial Rules and supervision of the American Arbitration Association ("AAA"). The duty to arbitrate will extend to any employee, officer, agent or affiliate of either party. The arbitration will be held in the United States headquarters city of the party not initiating the claim except all claims initiated by [Lexis] for non-payment will be held in Dayton, Ohio. The arbitration will be conducted by a sole arbitrator who is knowledgeable with respect to the electronic information services industry and is an attorney. The arbitrator's award will be final and binding and may be entered in any court having jurisdiction. The arbitrator will not have the power to award punitive or exemplary damages, or any damages excluded by, or in excess of, any damage limitations expressed in this Order.

Each party will bear its own attorneys' fees and other costs (e.g., filing fees, internal costs, etc.) associated with the arbitration, except that the fees assessed by the AAA for the services of the arbitrator will be divided equally by the parties. If court proceedings to stay litigation or compel arbitration are necessary, the party who unsuccessfully opposes such proceedings will pay all associated costs, expenses and attorney's fees which are reasonably incurred by the other party. Issues of arbitrability will be determined in accordance and solely with the federal substantive and procedural laws relating to arbitration; in all other respects, the arbitrator will be obligated to apply and follow the substantive law of the state as specified in this Order and if none is specified, then the law of the state of New York.

To facilitate resolution of controversies or claims, the parties agree to keep negotiations, arbitrations and settlement terms confidential.

Claims and controversies involving either (a) violation of any of the proprietary rights of [Lexis], including claims in equity or law to protect the intellectual property rights of [Lexis] or its third-party content suppliers; or (b) failure to comply with restrictions on use of the services and materials

- 16 -

> included in this Order will not be subject to arbitration. [Lexis] retains at all
> times the right to obtain an injunction in court to prevent misuse of the
> [Lexis] Online Services and Materials contained therein and all [Lexis]
> Companies' products and services.

Doc. #18-1 at 36. The arbitration provision in the parties' second agreement,

which is referred to as a "Subscription Agreement," is not materially different from

that quoted above.[10]

The arbitration provisions in the parties' agreements are silent on the

question of classwide arbitration, in the sense that those clauses do not expressly

state that disputes arising thereunder can or cannot be resolved on a classwide

basis. Nevertheless, Defendants argue that the arbitration clauses in the parties'

agreements are not silent on the question of whether class arbitration will be

permitted. On the contrary, Defendants' argument continues, those provisions

mandate classwide arbitration, given that they require the resolution of "'any

controversy'" by arbitration. See Doc. #29 at 12. Defendants also point out that

the arbitration clauses incorporate by reference the then-current AAA Commercial

Rules and that the AAA Supplementary Rules for Class Arbitrations

("Supplementary Rules"), which have been in effect since October 8, 2003, and

are applicable to any dispute arising out of a dispute subject to arbitration under

any of the Rules of the AAA. This Court cannot agree with the Defendants that

either of those reasons requires that the arbitration clauses be interpreted in a

manner to permit classwide arbitration.

---

[10]In the arbitration clause of the Subscription Agreement the word "Agreement"
has been substituted for "Order."

The arbitration provisions provide that "any controversy … arising out of or in connection with this Order (or this Agreement)" shall be resolved through arbitration subject to the AAA Commercial Rules. Thus, the phrase "any controversy" is limited by the quoted language that follows. Quite simply, whether any member of either class the Defendants seek to represent (for instance, a client of a Seattle law firm) has been harmed by Plaintiff's alleged failure to warn customers when they are about to search databases outside their prescription areas does not arise out of nor is it in connection with the Order and the Agreement between Plaintiff and Defendants, given that neither the Order nor the Agreement require that such a warning be given. Therefore, such a hypothetical dispute does not qualify as "any controversy," meaning that it is not subject to arbitration under either agreement between the Plaintiff and Defendants and the AAA Commercial Rules are not, as a result, applicable.

Moreover, in its recent decision in AT&T Mobility LLC v. Concepcion, — U.S. —, 131 S.Ct. 1740 (2011), the Supreme Court explained its decision in Stolt-Nielsen:

> In [Stolt-Nielsen][,] we held that an arbitration panel exceeded its power under § 10(a)(4) of the FAA by imposing class procedures based on policy judgments rather than the arbitration agreement itself or some background principle of contract law that would affect its interpretation. 559 U.S., at —, 130 S.Ct. at 1773–1776. We then held that the agreement at issue, which was silent on the question of class procedures, could not be interpreted to allow them because the "changes brought about by the shift from bilateral arbitration to class-action arbitration" are "fundamental." Id., at —, 130 S.Ct. at 1776.

Id. at 1750.[11]  Similarly, given this Court's conclusion above that the agreements between the parties are silent on whether to permit classwide arbitration, it would be improper to interpret them to authorize such.

In addition, the Defendants contend that this Court must hold that the arbitration clauses in the parties' agreements authorize class arbitration, because, without such authorization, those agreements would be unconscionable contracts of adhesion.  For reasons which follow, this Court cannot agree.

Neither the Plaintiff nor the Defendants have explicitly addressed the question of which state's law this Court should apply when addressing the Defendants' contention concerning unconscionable contracts and those of adhesion.  Since the arbitration clauses in their agreements specify that New York law shall be utilized, unless otherwise specified therein and the agreements do not indicate that another state's law is applicable, this Court will apply New York law, assuming that the decision is controlled by the law of a state, rather than by federal law.[12]  For reasons which follow, this Court concludes that, regardless of whether New York or federal law is applied, the evidence fails to raise a genuine issue of material fact as to whether the parties' agreements were contracts of

---

[11]Parenthetically, the Supreme Court has made it more difficult to certify any class action by focusing on the commonality requirement set forth in Rule 23(a)(2). Wal-Mart Stores, Inc. v. Dukes, — U.S.—, 131 S.Ct. 2541 (2011).

[12]Therefore, this Court does not find Raasch v. NCR Corp., 254 F. Supp.2d 857 (S.D.Ohio 2003), the decision relied upon by Defendants to support this argument, to be persuasive.  Therein, this Court applied Ohio law in concluding that a contractual provision requiring employees to arbitrate their employment disputes with their employer did not constitute a contract of adhesion.

adhesion, merely because the arbitration clauses therein do not permit class arbitration.[13]

In Ranieri v. Bell Atlantic Mobile, 304 A.D.2d 353, 354, 759 N.Y.S.2d 448, 449 (N.Y. App. Div. 2003), the court noted that a contract is not unconscionable or one of adhesion, when substitute sources of the subject matter of the contract are available. Thus, the Ranieri court held that the contract between the parties therein was not unconscionable or one of adhesion, merely because its arbitration provision prevented classwide arbitration, given that substitute sources of cellular telephone service, the subject matter of the contract, were available. There was no indication therein that the plaintiff could not have chosen an alternative service provider. Herein, it could not be disputed that a substitute to Plaintiff's computerized research was available, to wit: Westlaw provided by Thomson Reuters. As a consequence, the Court concludes that the agreements between the parties were not contracts of adhesion under New York law.

---

[13]Parenthetically, if this Court were to apply Ohio law, it would reach the same conclusion. In W.K. v. Farrell, 167 Ohio App.3d 14, 853 N.E.2d 728 (2006), the court explained that, "[i]n order to raise the issue of the possible unconscionability or adhesive nature of a contract, a plaintiff must show (1) that the contract terms are one-sided or unreasonably favorable to the other party, (2) that disparity between the parties' bargaining power denies the less advantaged party meaningful choice in accepting the terms of the contract, and (3) that the less advantaged party cannot obtain the desired product or services except by acquiescing in the contract." Id. at 25-26, 853 N.E.2d at 737 (emphasis added). Herein, the evidence fails to raise a genuine issue of material fact on the second and third elements of that test. Crockett himself indicated that the terms of Defendants' agreements with Plaintiff were negotiable. Moreover, since alternatives to Plaintiff's Lexis service were available to the Defendants, it cannot be argued that they could not obtain computerized legal research, except by acquiescing in the language contained in the arbitration provisions of their agreements with Plaintiffs.

A number of federal Circuit Courts of Appeal have held it to be a question of federal law whether a provision in a contract calling for arbitration is void, as being unconscionable or a contract of adhesion, because the provision prohibits class arbitration. See e.g., In re American Express Merchants' Litigation, 634 F.3d 187, 194 (2d Cir. 2011) (applying federal law when determining whether mandatory class action waiver in arbitration agreement was void);[14] Gay v. CreditInform, 511 F.3d 369, 394–95 (3d Cir. 2007) (holding class action waiver to be enforceable under federal law notwithstanding claim that waiver was unconscionable under state law); Kristian v. Comcast Corp., 446 F.3d 25, 63 (1st Cir. 2006) (holding that, "[a]lthough Plaintiffs' challenges to the enforceability of the arbitration agreements could be evaluated through the prism of state unconscionability law, we have chosen to apply a vindication of statutory rights analysis, which is also part of the body of federal substantive law of arbitration").[15] In accordance with those decisions, the Court turns to the question of whether, under federal law, the parties' agreements are contracts of adhesion, because the arbitration clauses therein do not permit class arbitration.

In Johnson v. West Suburban Bank, 225 F.3d 366 (3d Cir. 2000), the Third Circuit addressed the question of whether an arbitration agreement was void as

---

[14]It is doubtful that the decision of the Second Circuit to void the waiver is good law, given the decision of the Supreme Court in AT&T Mobility LLC v. Concepcion, — U.S. —, 131 S.Ct. 1740 (2011), which is discussed in the text below. See infra, at 22-24.

[15]Unlike the present dispute, those three cases arose out of the question of the waiver of the ability to proceed on behalf of a class to enforce federal statutory claims. Herein, Defendants seek to arbitrate on a class basis only common law claims under the law of New York.

unconscionable or a contract of adhesion, because it expressly excluded class arbitration.  The plaintiff had set forth claims under the Truth in Lending Act, 15 U.S.C. § 1601, et seq., and the Electronic Fund Transfer Act, 15 U.S.C. § 1693, et seq., seeking to have the litigation certified as a class action.  The plaintiff's claims arose out of a loan agreement, under which plaintiff borrowed $250.00 from defendant, at the annual rate of 917% interest.  225 F.3d at 369.  The defendant moved to stay the proceedings and to compel arbitration.  Although the District Court denied that relief, the Third Circuit disagreed, holding, inter alia, that preventing plaintiff from obtaining classwide relief for the alleged violations was neither unconscionable nor did it result in the parties' agreement becoming a contract of adhesion.

Even if this Court had concluded that either state or federal law required this Court to interpret the parties' agreements in such a manner to allow classwide arbitration, this Court could not give effect to that construction, because it would be contrary to the April 27, 2011, decision by the United States Supreme Court in AT&T Mobility LLC v. Concepcion, — U.S. —, 131 S.Ct. 1740 (2011).  Therein, the respondents, Vincent and Liza Concepcion ("Concepcions"), filed suit against the petitioner, AT&T Mobility LLC ("AT&T"), alleging that they had been wrongfully charged the sum of $30.22, as sales tax for their phone.  The Concepcions brought that lawsuit as a putative class action.  AT&T moved to stay the litigation and compel arbitration, in accordance with the arbitration provision in the parties' contract.  The Concepcions opposed that request, arguing that the arbitration provision was unconscionable and a contract of adhesion, given that it prohibited

class arbitration. The District Court overruled the request to compel arbitration, because California law (<u>Discover Bank v. Superior Court</u>, 113 P.3d 1100 (Cal. 2005)) provided that a contract that prohibited classwide treatment of disputes was unconscionable. Upon appeal, the Ninth Circuit affirmed, also finding the arbitration provision unconscionable under <u>Discover Bank</u>. Upon further appeal, the United States Supreme Court reversed, holding that the rule announced by the California Supreme Court in <u>Discover Bank</u> was preempted by the FAA. The <u>AT&T Mobility</u> Court also concluded that the final clause of § 2 of the FAA, 9 U.S.C. § 2, did not save that rule established in <u>Discover Bank</u>. Section 2 provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, <u>save upon such grounds as exist at law or in equity for the revocation of any contract</u>.

9 U.S.C. § 2 (emphasis added).

To reach that conclusion, the <u>AT&T Mobility</u> Court reiterated that the principle purpose of the FAA "'is to ensur[e] that private arbitration agreements are enforced according to their terms.'" 131 S.Ct. at 1745 (quoting <u>Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.</u>, 489 U.S. 468, 478 (1989)) (brackets in the original). The <u>AT&T Mobility</u> Court also reviewed the manner in which class arbitration differs from the arbitration of individual claims:

> Classwide arbitration includes absent parties, necessitating additional and different procedures and involving higher stakes. Confidentiality becomes more difficult. And while it is theoretically possible to select an arbitrator with some expertise relevant to the class-certification question, arbitrators

are not generally knowledgeable in the often-dominant procedural aspects of certification, such as the protection of absent parties.  The conclusion follows that class arbitration, to the extent it is manufactured by <u>Discover Bank</u> rather than consensual, is inconsistent with the FAA.

<u>Id</u>. at *10.[16]  <u>See</u> <u>also</u> <u>Id</u>. at *8 (holding that "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA").  Similarly, this Court concludes that classwide arbitration, to the extent manufactured by a rule of contract construction that would render arbitration agreements unconscionable contracts of adhesion if interpreted not to permit class arbitration, would be inconsistent with the FAA.

Accordingly, the Court rejects the Defendants' assertion that the parties' agreements must be interpreted as permitting class arbitration, because the contrary construction would result in them being unconscionable contracts of adhesion.

The Defendants also contend that this Court should conclude that the arbitration clauses in their agreements with Plaintiff authorize class arbitration, because without class arbitration they have no practical recourse for the harm they have suffered as a result of Plaintiff's failure to provide some sort of warning that Defendants were about to view documents from a data base outside their plan and, therefore, to incur additional expenses.  <u>See</u> Doc. #29 at 1-2 and 20.  Defendants state that their claims do not have great value, making it impractical to pursue

---

[16]The <u>AT&T Mobility</u> Court also noted that class arbitration differs from bilateral arbitration, because classwide arbitration sacrifices informality of bilateral arbitration, and makes the process slower, more costly and more likely to end in a procedural morass than with a final judgment.  131 S.Ct. at 1751.

them independently. The flaw in this argument is that it is contrary to the view expressed by the Supreme Court in Stolt-Nielsen, holding that class arbitration is not permitted when an arbitration agreement is silent on that question. Indeed, in support of this argument, the Defendants rely on the dissenting opinion from Stolt-Nielsen, which did not establish principles of law which this Court must follow. Accordingly, this Court rejects the Defendants' argument that it must conclude that the arbitration clauses in the parties' agreements authorize class arbitration, because they would be without recourse if the Court were to hold otherwise.[17]

---

[17]Parenthetically, Plaintiff has recently furnished this Court a copy of Jock v. Sterling Jewelers, Inc., 646 F.3d 113 (2d Cir. 2011) ("Jock II"), in which the Second Circuit reversed the District Court's opinion in Jock v. Sterling Jewelers, Inc., 725 F. Supp.2d 444 (S.D.N.Y. 2010) ("Jock I"), a decision which Reed Elsevier had cited a number of times in its Reply Memorandum in Support of Summary Judgment. See Doc. #34. Although this Court has not cited the District Court's decision in Jock herein, it will briefly explain why the applicable part of the Second Circuit's decision therein does not alter this Court's conclusions.

In Jock I, unlike this litigation, the parties had agreed to submit the issue of class arbitrability to the arbitrator. Consequently, the decision of the Second Circuit in Jock II does not affect this Court's conclusion herein that the question of arbitrability must be decided by the Court, rather than by an arbitrator.

After the Supreme Court had decided Stolt-Nielsen, the District Court in Jock I concluded that the arbitrator had erroneously held that classwide arbitration was permissible, given that he had relied upon the decision of the Second Circuit in Stolt-Nielsen, which the Supreme Court had reversed. The majority of the panel in Jock II reversed and limited the applicability of Stolt-Nielsen to cases arising out of the identical factual circumstance, i.e., when the parties stipulate that their arbitration agreement is silent on the question of classwide arbitration, as well as distinguishing the Supreme Court decision for a number of other reasons. For reasons set forth in the text of this decision, as well as in the dissent in Jock II (which appears to be well reasoned and faithful to Supreme Court authority), this Court deems it inappropriate to limit or to distinguish Stolt-Nielsen in such a manner. Rather, that Supreme Court decision must be given a full and fair reading, so that it applies whenever the parties' agreement is silent on the issue of classwide arbitration, regardless of the existence of a stipulation by the parties to that effect. Moreover, to so limit or distinguish Stolt-Nielsen would contravene the continued rollback of classwide arbitration exemplified by AT&T Mobility.

Based upon the foregoing reasoning, this Court has sustained the Plaintiff's Motion for Partial Summary Judgment (Doc. #7).  As a consequence, the Court will direct that judgment be entered, at the conclusion of this litigation, in favor of the Plaintiff and against Defendants on the first claim for relief in Plaintiff's Complaint (Doc. #1).

Counsel will note that the Court has scheduled a telephone conference call on Tuesday March 6, 2012, at 8:30 a.m., for the purpose of discussing procedures leading to the resolution of the Plaintiff's second claim for relief.


February 24, 2012

_____

WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT


Copies to:

Counsel of Record.